Michael P. West, Esq. (SBN 172478)
Ashley A. Escudero, Esq. (SBN 250473)
**CLARK HILL LLP**
1055 West Seventh Street, 24th Floor
Los Angeles, California 90017
Telephone:  (213) 891 9100
Facsimile:  (213) 488-1178
mwest@clarkhill.com
aescudero@clarkhill.com

Attorneys for Defendants,
SUNRISE SENIOR LIVING MANAGEMENT, INC., WELLTOWER OPCO
GROUP, LLC DBA SUNRISE VILLA CULVER CITY, and SHANE FOWLER

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| GERALD HOPMAN, in and through his Successor-in-Interest, JESSICA HOPMAN, and JESSICA HOPMAN, individually,<br><br>                         Plaintiffs,<br><br>          vs.<br><br>SUNRISE VILLA CULVER CITY; WELLTOWER OPCO GROUP LLC dba SUNRISE VILLA CULVER CITY; SUNRISE SENIOR LIVING MANAGEMENT, INC.; SHANE FOWLER, an individual; and DOES 1 through 50, inclusive,<br><br>                         Defendants. | Case No.:<br><br>**DEFENDANTS SUNRISE SENIOR LIVING MANAGEMENT, INC., WELLTOWER OPCO GROUP, LLC dba SUNRISE VILLA CULVER CITY, and SHANE FOWLER'S NOTICE OF REMOVAL OF CIVIL ACTION**<br><br>[RE: Los Angeles Superior Court Case No. 20STCV25558] |

COME NOW, Defendants SUNRISE SENIOR LIVING MANAGEMENT, INC., WELLTOWER OPCO GROUP, LLC dba SUNRISE VILLA CULVER CITY, and SHANE FOWLER (collectively "Defendants" or "Covered Persons"), by and through their undersigned counsel, and hereby remove this action from the Superior Court of the State of California, County of Los Angeles, to the United States District Court for the Central District of California, Western Division, based on an intervening change in the law pursuant to 28 U.S.C. § 1446(b)(3), and pursuant to 28 U.S.C.A. §§ 1441 and 1446, while reserving all defenses and objections to venue based on 42

1

U.S.C.A § 247d-6d(e)(1), and state as follows:

## I.   STATEMENT OF CASE AND BASIS FOR SECOND REMOVAL

1.      This action was originally filed in the Superior Court of the County of Los Angeles, California as Case No. 20STCCV25558 on July 7, 2020. (Exhibit A, Summons and Complaint).

2.      On August 7, 2020, Defendants filed a Notice of Removal based on The Public Readiness and Emergency Preparedness Act, 42 U.S.C.A. § 247d-6d (the PREP Act"), and pursuant to 28 U.S.C.A. §§ 1441 and 1446. In their Notice of Removal, Defendants asserted that federal jurisdiction existed over Plaintiffs' claims because the PREP Act completely preempts the causes of action in the Complaint for elder abuse, negligence, breach of contract, willful misconduct[1], and wrongful death resulting from alleged misconduct by a covered person in the administration of a covered countermeasure under the PREP Act, 42 U.S.C.A. § 247d-6d. *See Hopman v. Sunrise Villa Culver City*, Case No. 20-cv-07141-RGK-JEM at Dkt. No. 1.

3.      On August 25, 2020, this Court issued an Order Remanding Civil Action to the Superior Court of Los Angeles County, finding that federal jurisdiction did not exist because the allegations in the Complaint, at least on their face, did not invoke the PREP Act.[2] *See Hopman v. Sunrise Villa Culver City*, Case No. 20-cv-07141-RGK-

---

[1]      A separate Complaint for Declaratory Judgment regarding Plaintiffs' willful misconduct allegations is pending in the United States District Court for the District of Columbia. *See Fowler v. Hopman*, Case No. 1:20-cv-03854 (D.D.C). The D.D.C. action concerns **only** the willful misconduct allegations for which the D.D.C. is the exclusive forum under the PREP Act pursuant to 42 U.S.C. §§ 247d-6d(d), (e)(1)&(5). All other non-willful misconduct allegations must be litigated in this Court pursuant to the complete preemption doctrine pursuant to 42 U.S.C.A. § 247d-6d.

[2]      It is black letter law that a federal or state statute may be invoked in a complaint, even if it is not mentioned by name.  *See JKC3H8 v. Colton*, 221 Cal. App. 4th 468, 478 (Cal. App. 2013). To allow a plaintiff to avoid the PREP Act through artful pleading "would totally frustrate the Legislature's objective of providing a quick and inexpensive method of unmasking and dismissing such suits." *Id.*

JEM at Dkt. No. 14. At the time of the remand, federal law governing the PREP Act's application in the context of the COVID-19 pandemic was still undeveloped.

4.     Since that time, on January 8, 2021, the Secretary of the Department of Health and Human Services ("HHS") issued new controlling authority (hereinafter "AO 21-01") confirming unequivocally that: 1) the PREP Act is indeed invoked by allegations like those in the Complaint, including alleged failure to act or inaction; 2) the PREP Act is a "Complete Preemption" Statute which confers federal question removal jurisdiction under 28 U.S.C. § 1441(a); and 3) federal jurisdiction is separately conferred in such cases under the doctrine articulated by the United States Supreme Court in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg*., 545 U.S. 308 (2005), because "ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that ***the case belongs in federal court***." (emphasis added).[3]

5.     AO 21-01 is binding on this court, as the HHS Secretary has now incorporated all HHS Advisory Opinions pertaining to COVID-19 into the PREP Act's implementing Declaration itself, and proclaimed that the Declaration "must" be construed in accordance with them. *See* Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration, 85 Fed. Reg. 79190 (Dec. 9, 2020) (the "Fourth Amendment" or "Amendment"). As such, the HHS Advisory Opinions are no longer "advisory," they now have the same "controlling weight" as the Declaration and the PREP Act itself. And where Congress has expressly delegated interpretative authority to an agency, that agency's interpretative proclamations are

---

[3]     *The Office of the General Counsel, Secretary of the Department of Health and Human Services,* Advisory Opinion 21-01 On the Public Readiness And Emergency Preparedness Act Scope of Preemption Provision, https://www.hhs.gov/guidance/document/advisory-opinion-21-01-public-readiness-and-emergency-preparedness-act (issued January 8, 2021).

CLARKHILL\61560\410577\261999860.v1-2/5/21

1   controlling on the federal courts. *See Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S.

2   837, 843-44 (1984). To avoid any doubt on this point, the Secretary amended the

3   Declaration for the fifth time on January 28, 2021, confirming again in the Declaration

4   itself that the PREP Act is a complete preemption statute.[4]  Congress has reinforced the

5   Secretary's ultimate authority over these matters concerning the PREP Act, and warns

6   that "[n]o court . . . shall have subject matter jurisdiction to review, whether by

7   mandamus or otherwise, any action by the Secretary under [the PREP Act.]" 42 U.S.C.

8   § 247d-6d(b)(1), (4) & (7).

9        6.    Based on this new, intervening, and controlling authority from HHS,

10  Defendants hereby remove this case to the United States District Court for the Central

11  District of California. This Notice of Removal is timely because it is filed within thirty

12  (30) days from the issuance of AO 21-01, which was issued January 8, 2021. *See* 28

13  U.S.C. § 1446(b)(3) ("[I]f the case stated by initial pleading is not removable, a notice

14  of removal may be filed within thirty days after receipt by the defendant, through

15  service or otherwise, of a copy of an amended pleading, motion, order, or other paper

16  from which it may first be ascertained that the case is one which is or has become

17  removable."); *Rea v. Michael's Stores, Inc.*, 742 F.3d 1234, 1238 (9th Cir. 2014)

18  (finding that the defendant had thirty (30) days to file a successive removal petition

19  following a relevant change in law).

20       7.    A relevant change in the law justifying removal has occurred because at

21  the time of the original Order remanding this case, the law was undeveloped as to how

22  the PREP Act is triggered, and specifically whether the PREP Act was a complete

23  preemption statute. Since then, HHS has issued authority that, pursuant to the

24

25

---

26  [4]    *See* Fifth Amendment to the Declaration Under the Public Readiness and
27  Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and
     Republication of the Declaration, (Jan. 28, 2021).

28

**NOTICE OF REMOVAL OF ACTION**

CLARKHILL\61560\410577\261999860.v1-2/5/21

1   Declaration, courts must use to resolve these questions, including AO 21-01, which

2   confirms for the first time that the PREP Act is a ***complete preemption statute.***

3     8. This new authority arrives on the heels of other HHS authorities that have

4   provided additional, helpful guidance to the courts in construing the PREP Act.  For

5   example, Advisory Opinion 20-04 confirms that any individual or organization can

6   potentially be a program planner and receive PREP Act coverage" -- even grocery

7   stores, universities, private businesses, places of worship, and private transportation

8   providers."[5] HHS issued separate guidance letters specifically confirming that senior

9   living communities, such as Defendants and other residential care facilities for the

10   elderly (RCFEs), are program planners or qualified persons under the PREP Act when

11   they administer or use diagnostic testing and other covered countermeasures.[6]

12     9. Subsequently, the Fourth Amendment made "explicit that there can be

13   situations where ***not*** administering a covered countermeasure to a particular individual

14   can fall within the PREP Act and this Declaration's liability protections," as discussed

15   more fully  below, and also incorporated all HHS Advisory Opinions into the

16   Declaration itself, thus giving them controlling  weight.  85 Fed. Reg. 79190 (emphasis

17   added).  Even after AO 21-01 was issued on January 8th, the Secretary again amended

18   the Declaration with the Fifth Amendment on January 28, 2021, stating "[t]he ***plain***

19   ***language of the PREP Act makes clear that there is complete preemption of state***

20   ***law***."[7]

21

22   [5] HHS Advisory Opinion 20-04, https://www.hhs.gov/sites/default/files/advisory-

23   opinion-20-04-hhs-ogc-publicreadiness-emergency-preparedness-act.pdf   ("AO   20-

  04")

24   [6] *See* HHS Guidance Aug. 31, 2020,

25   https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/prep-act-

26   coverage-for-screening-in-congregate-settings.pdf

27   [7] *See* Fifth Amendment to the Declaration Under the Public Readiness and

Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and

28   Republication of the Declaration, (Jan. 28, 2021).

**NOTICE OF REMOVAL OF ACTION**

10.     In addition to these HHS authorities, the U.S. Department of Justice ("DOJ") filed a Statement of Interest ("SOI") of the United States in *Bolton v. Gallatin Center for Rehabilitation & Healing, LLC*, No. 3:30-cv-00683 (M.D. Tenn. Jan. 19, 2021) at Dkt. No 35, which constitutes the official position of the United States' interest in the enforcement of the PREP Act providing, *inter alia*, that:

a. The PREP Act is crucial to the "whole-of-nation response" to public health emergencies. *Id.* at 1–2. This response depends on the cooperation among private-sector partners and state and local officials across the nation and that "sweeping" immunity was granted to encourage such cooperation. *Id.* at 2.

b. Federal jurisdiction is proper since the PREP Act's exclusive federal cause of action creates federal question jurisdiction. *Id.* at 3.

c. PREP Act immunity for all Federal and state law claims and a sole exception to immunity claims process makes the PREP Act a complete preemption statute. *Id.* at 7–8.

d. It is the nature of a complaint that determines complete preemption, not the stated claims. *Id.* at 6.

e. *Maglioli* and its progeny's interpretations of the PREP Act's complete preemptive effect are incorrect and that their holdings should be limited to their facts. *Id.* at 10–12.

The DOJ's SOI commenting on the scope of a federal court's jurisdiction is of "considerable interest" to the courts. *See Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004); *see also Garb v. Republic of Poland*, 440 F.3d 579, 584 (2d Cir. 2006).

11.     Most recently, this very Court considered a case with strikingly similar facts and issued a 17-page tentative ruling denying the plaintiffs' motion to remand and

**NOTICE OF REMOVAL OF ACTION**
CLARKHILL\61560\410577\261999860.v1-2/5/21

granting the defendants' motion to dismiss.[8] Specifically, Judge Selna held that "[t]he acts and omissions alleged by Plaintiffs appear almost verbatim in the January 8, 2021 Advisory Opinion" and that accordingly, the PREP Act applied to the plaintiffs' claims. *Id*. at 14. This Court concluded that "because the OGC stated that the PREP Act is a complete preemption statute . . . an adequate basis for federal question jurisdiction exists." *Id*.

12.   To be clear, while all of these authorities are important and must be read together, it is AO 21-01 that is the intervening authority for this successive removal petition, as it provided the first official confirmation from the Secretary that the PREP Act is a complete preemption statute, which was subsequently confirmed in the Fifth Amendment to the Declaration.

13.   Removal to the United States District Court for the Central District of California, Western Division, is proper because the Complaint was filed in the Superior Court of the State of California for the County of Los Angeles, which is located within the jurisdiction of this District. *See* 28 U.S.C. § 1441(a) and 28 U.S.C. § 84(c)(2).

14.   Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiffs, and a copy is being filed with the Clerk of the Court for the Superior Court of the State of California for the County of Los Angeles.

## II.   FACTUAL ALLEGATIONS IN THE COMPLAINT

15.   From approximately September 2018 through May 2020, the decedent, Gerald Hopman ("Mr. Hopman"), was a resident at Sunrise Villa Culver City ("Sunrise Villa" or "The Facility"), an RCFE located in Los Angeles, California. *See* Exhibit A at ¶¶ 28, 52.

16.   On or about September 2, 2018, Mr. Hopman moved into the Facility. *See* Exhibit A at ¶ 28.

---

[8]   *See Garcia v. Welltower OpCo Group LLC*, No. 8:20-cv-02250-JVS-KESx (C.D. Cal), https://www.cacd.uscourts.gov/honorable-james-v-selna#tentativerullings.

**NOTICE OF REMOVAL OF ACTION**

17.     In early 2020, the COVID-19 pandemic began to spread throughout the country, including the State of California.[9]

18.     In response to the rising number of COVID-19 cases in California, Governor Gavin Newsom declared a state of emergency on March 4, 2020 through Executive Order N-27-20.[10]

19.     Among other reasons, a state of emergency was declared "to make additional resources available, formalize emergency actions already underway across multiple state agencies and departments, and help the state prepare for broader spread of COVID-19."[11]

20.     The state of emergency declaration included "provisions that protect consumers against price gouging, allow for health care workers to come from out of state to assist at health care facilities, and give health care facilities the flexibility to plan and adapt to accommodate incoming patients." *Id.*

21.     As of the time of this filing, California remains in a state of emergency. *See id.*

**A.     Sunrise Villa Enhances Its Infection Control Program And Implements Additional Protocols To Prevent The Spread of COVID-19 At The Facility.**

22.     When the COVID-19 pandemic began to spread through California, in an effort to prevent and curtail its spread to the Facility, Defendants developed and implemented a COVID-19 Mitigation Response Plan ("Mitigation Response Plan"), and enhanced and regularly updated its existing infection control program based on

---

[9]     *See* WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-mediabriefing-on-covid-19---11-march-2020.

[10]    *See* Proclamation of a State of Emergency (Mar. 4, 2020) https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/

[11]    *Id.*

**NOTICE OF REMOVAL OF ACTION**

guidance from the Centers for Disease Control and Prevention ("CDC") for infection control and prevention in long-term care settings.  This infection control program included, inter alia, personal protective equipment ("PPE"), such as masks, gowns, eye protection, and gloves; diagnostic testing; symptom screening and testing; sanitization and disinfecting procedures; quarantining and community restriction measures in the areas of activities, dining, and visitation; and social distancing.  *See* Exhibit A at ¶ 44, 45; Exhibit B, Sunrise Villa letter dated April 24, 2020; Exhibit C, Sunrise Villa letter dated April 25, 2020; Exhibit D, Sunrise Villa letter dated April 25, 2020.[12]

23.    On or about March 13, 2020, Defendants advised by letter that the Facility was adhering to all state and local executive orders and official guidelines, discouraging routine social visits, requiring visits to occur in residents' suites, and actively screening team members for illness.  *See* Exhibit E, Sunrise Villa letter dated March 13, 2020.

24.    On or about March 13, 2020, in response to the spread of COVID-19, Defendants informed the residents of the Facility and their families by letter that the Facility was "taking precautions to prevent contraction and the spread of COVID-19 at the facility," and mandatory screening protocols for all visitors.  *See* Exhibit A at ¶ 36; Exhibit E.  As part of these precautions, Defendants began a lockdown at the Facility under which only "essential visitors" were permitted to enter the facility.  *See* Exhibit A at ¶ 36.  All essential visitors entering the facility were required to sign in and disclose if they had recently traveled to certain locations identified by public health officials as locations with significant spread of COVID-19.  Essential visitors were not permitted if they had a fever or were exhibiting any signs of illness.  In addition,

---

[12]    Plaintiffs' Complaint expressly references and quotes from letters dated March 13, 2020, April 24, 2020, and April 25, 2020. Where written documents are the foundation of an action and are attached to the complaint and incorporated therein by reference, they become a part of the complaint . . . .." *City of Pomona v. Superior Court* (2001) 89 Cal. App. 4th 793, 800, as modified, (June 29, 2001); *Picton v. Anderson Union High School Dist.* (1996) 50 Cal. App. 4th 726, 730.

**NOTICE OF REMOVAL OF ACTION**

residents of the Facility were quarantined in their apartments or rooms and all meals and activities were provided in-room.  *See* Exhibit A at ¶ 36.

25.    Mr. Hopman's successor in interest, Jessica Hopman ("Ms. Hopman"), acknowledges that she received the March 13 letter. *See* Exhibit A at ¶ 36.

26.    On or about March 17 and 18, 2020, Ms. Hopman alleges that Mr. Fowler contacted her personally and told her that Mr. Hopman was doing fine and being cared for by Sunrise staff.  *See* Exhibit A at ¶¶ 37, 38.

27.    Ms. Hopman further alleges that she received a similar call on March 24, 2020.  *See* Exhibit A at ¶ 38.

28.    On or about March 30, 2020, Ms. Hopman alleges she contacted Mr. Fowler "as she heard there were cases of residents who had contracted COVID-19 at [the Facility]."  *See* Exhibit A at ¶ 39.  According to Ms. Hopman, Mr. Fowler "assured [her] that there were no cases of residents contracting COVID-19, that Mr. Hopman was fine and had no symptoms of the virus, and that the facility was 'in a good position right now as a whole' since the residents were [quarantined] in their apartments."  *See* Exhibit A at ¶ 39.

29.    On or about April 3, 2020, Ms. Hopman alleges that she was again notified by Mr. Fowler that "all residents at [the Facility] were required to stay in their rooms at all times" and that "he and [the Facility's] staff were formulating a plan to continue to care for the residents at [the Facility] while they remain [quarantined]."  *See* Exhibit A at ¶ 40.

30.    On or about April 16, 2020, in accordance with Article V.F. of the Residency Agreement, Covered Persons relocated Mr. Hopman into a room at Terrace Club, a memory care unit within the Facility.  *See* Exhibit A at ¶ 41; *see also* Exhibit A, Ex. 1 (Residency Agreement).

31.    Ms. Hopman alleges that on or about April 18, 2020, she "noticed the common areas at the assisted living unit were empty as residents were confined to their rooms and any gathering in the common areas was not permitted."  *See* Exhibit A

1  at ¶ 43.

2      32.    On or about April 24, 2020, Ms. Hopman alleges that a Facility employee

3  informed her that a resident of the Terrace Club tested positive for COVID-19.  *See*

4  Exhibit A at ¶ 44.

5      33.    On or about April 24, 2020, Defendants sent a letter to the residents of the

6  Facility and their families advising that it "continue[d] to work closely with the Los

7  Angeles County Health Department to do all we can to protect the health and safety of

8  our residents and team members in the face of the global COVID-19 pandemic."

9  Exhibit B; *see also* Exhibit A at ¶ 44.  The letter further advised that the Facility was

10  "requesting to take advantage of the health department's new testing program which

11  allows for all residents and team members to be tested."  Exhibit B.

12      34.    The April 24 letter also detailed a number of countermeasures that

13  Defendants were taking to combat the spread of COVID-19:

14      We are requesting to take advantage of the health department's new testing

15      program which allows for all residents and team members to be tested.

16      We are currently attempting to contact the health department and hope to

17      soon share the date when they will be available to come to the community

18      to complete COVID-19 testing for residents and team members who have

19      not previously been tested.

20      . . .

21      [R]egardless of the results of the test we will continue to care for all of our

22      residents with the necessary precautions and isolation if symptomatic.

23      ***These measures include wearing full personal protective equipment,***

24      ***such as masks, gloves and gowns, while providing direct care to any***

25      ***residents with symptoms, and continuing our infection control protocols***

26      ***throughout the community including in-room dining, one-to-one***

27      ***resident engagement, essential visitors only and supporting all residents***

28      ***as they remain in their suites.  All of our team members continue to wear***

11

**NOTICE OF REMOVAL OF ACTION**

***masks throughout the community,*** and we are asking residents who are comfortable with a mask to use one while they are receiving direct care as well.

. . .

Team members who may be positive, even if they are not symptomatic, will be asked to ***self-quarantine*** at home for at least 10 days ***per guidance from the CDC***.

**Exhibit B** (emphasis added).

35. Ms. Hopman acknowledges that she received a copy of the April 24 letter. *See* Exhibit A at ¶ 44.

36. On or about April 25, 2020, Defendants sent two additional letters to the residents of the Facility and their families. *See* Exhibit A at ¶ 45.

37. The first letter informed residents and their families that there had been "a positive diagnosis of COVID-19 at our community" and that Defendants were "working closely with the local health department to do all we can to protect the health and safety of our residents and team members[.]"  Exhibit C.  At the health department's direction, Defendants "submitted [an] application for mobile testing with L.A. Mayor Garcetti's office, which is providing this service for assisted living communities in the area."  Exhibit C.

38. Later the same day, Defendants sent another letter to the Facility's residents and their families to assure them it was "following guidance from the CDC and local department of health as well as closely coordinating with our corporate leadership teams to implement additional precautions in our community."  Exhibit D.

39. The letter further advised that Defendants were working with third-party vendor services to complete a deep cleaning of its facilities, and that it was "carefully monitoring residents and team members for signs of illness daily."  Exhibit D.  In addition, Defendants reiterated that they had spent the past several weeks "reinforcing [its] infection control procedures to keep [its] community healthy and minimize any

spread of infection." Exhibit D. The letter described a number of countermeasures Defendants had taken and continued to take, including:

(a)   "Securing the entrance to our community and restricting all visitors except those essential to the health of our residents or at end-of-life."

(b)   "Conducting temperature and respiratory symptoms checks on residents twice a day."

(c)   "Screening everyone who enters our community, including screening team members at the start of each shift for signs of illness, recent travel history, and possible exposure."

(d)   "Using appropriate personal protective equipment (PPE) in caring for residents."

(e)   "Promoting social distancing by residents and team members."

(f)   "Asking all residents to remain in their suites and extensively limiting time in common areas of the community."

(g)   "Serving all meals in resident suites and addressing individual residents' feeding needs with appropriate modifications where necessary."

(h)   "Engaging residents in one-on-one activities."

(i)   "Facilitating social and emotional connections for our residents by arranging opportunities for virtual visits and phone conversations with families and loved ones."

40.   The Facility further informed residents and their families that its "teams are equipped with PPE to use when needed for their and residents' protection and to minimize the spread of infection," and that "[r]esidents who show any signs of respiratory illness will be supported with additional precautions." Exhibit D. These actions were undertaken in the face of a global shortage in PPE and available COVID-

**NOTICE OF REMOVAL OF ACTION**

19 tests.[13]

41.    Ms. Hopman acknowledges that she received both April 25 letters.  *See* Exhibit A at ¶ 45.

**B.    Mr. Hopman Tests Positive for COVID-19.**

42.    On or about April 30, 2020, Mr. Hopman and other residents of the Facility were tested for COVID-19.  *See* Exhibit A at ¶ 46.

43.    Despite the reasonable and appropriate infection control program implemented, supervised, and administered at the Facility, Ms. Hopman alleges that Mr. Hopman tested positive for COVID-19 on or about May 4, 2020.  *See* Exhibit A at ¶ 47.

44.    Such diagnostic testing administered by Defendants, as well as the other actions, including but not limited to those described in the February, March, and April letters, constitute "covered countermeasures" under the PREP Act, which is defined to include, *inter alia,* "qualified pandemic or epidemic products," as well as "drugs, biological products or devices authorized for investigational or emergency use," or "a respiratory protective device" approved by the National Institute for Occupational Safety and Health ("NIOSH") and determined to be a priority for use during a public health emergency.  *See* 42 U.S.C.A. § 247d-6d(i)(1), (8).  The definition of "covered countermeasure" applies to a large number of products, including any devices approved by the FDA,[14]  any products subject to Emergency Use Authorizations ("EUAs")[15],

---

[13]    *See Shortage of Personal Protective Equipment Endangering Health Workers Worldwide,* World Health Organization, https://www.who.int/news/item/03-03-2020-shortage-of-personal-protective-equipment-endangering-health-workers-worldwide.

[14]    *See generally*, 21 C.F.R. Ch 1, Subchapter H (with respect to devices).

[15]    *See Emergency Use Authorization*, U.S. Food & Drug Admin., https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#covidppe

**NOTICE OF REMOVAL OF ACTION**

personal protective equipment ("PPE"),[16]  disinfectants,[17]  COVID-19 diagnostic test kits,[18]  and thermometers.[19]  42 U.S.C.A. § 247d-6d(i)(1); 85 Fed. Reg. at 15202.

45.    Plaintiffs allege that Mr. Hopman's death was caused by Defendants' acts or omissions involving various covered countermeasures.  Specifically, the *Hopman* complaint alleges:

- "***[A]s a result*** of Defendants['] . . . failure to allow Mr. HOPMAN to remain isolated in his studio apartment and forcing him to move to a room at the Terrace Club, Mr. HOPMAN was unnecessarily exposed to COVID-19 and became infected.  Defendants' failure to recognize or treat Mr. HOPMAN's change of condition, failure to report this change of condition to his physician for an accurate physical assessment, and failure to transfer him to an acute medical facility ***resulted*** in Mr. HOPMAN going untreated while infected with COVID-19.   Mr. HOPMAN's withholding of treatment ***resulted*** in his untimely death."  *See* Exhibit A at ¶ 56 (emphasis added).

- "Defendants . . . had within their power, ability, and discretion to mandate that their facility employ adequately trained staff to meet the needs of their residents, including the Plaintiff, yet Defendants intentionally and/or with

---

[16]    *See, e.g.,* 21 C.F.R. §§ 878.4040 (2018) (surgical apparel), 880.6250 (2019) (non-powdered patient examination gloves), 880.6265 (2008) (examination gowns). The EUAs are available at https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/personal-protective-equipment-euas.

[17]    *See Enforcement Policy for Sterilizers, Disinfectant Devices, and Air Purifiers During the Coronavirus Disease 2019 (COVID-19) Public Health Emergency: Guidance for Industry and Food and Drug Administration Staff,* available at https://www.fda.gov/media/136289/download

[18]    *See* EUAs *supra* note 11.

[19]    *See, e.g.,* 21 CFR §§ 880.2200 (1980), 880.2900 (1980), 880.2910 (1980), 880.2920 (1980), 880.2930 (1998).

**NOTICE OF REMOVAL OF ACTION**

conscious disregard failed to do so, **which resulted in Mr. Hopman's injuries**." *See* Exhibit A at ¶ 58 (emphasis added).

- "**As a legal result of the acts and omissions** alleged herein, Mr. HOPMAN suffered damages including pain and suffering, and emotional harm." *See* Exhibit A at ¶ 88 (emphasis added).

- "Defendants' respective conduct was in violation of those statutes and regulations, as set forth herein, and was the **direct, actual, legal, and proximate cause** of Mr. HOPMAN's injuries." *See* Exhibit A at ¶ 98 (emphasis added).

- "**As a proximate result** of the conduct of Defendants as alleged in paragraphs 16-75 [of the Hopman complaint], Mr. Hopman died on May 12, 2020 from complications of the COVID- 19 virus infection." *See* Exhibit A at ¶ 114 (emphasis added).

## III.   SUCCESSIVE REMOVAL IS PROPER WHEN A DEVELOPMENT IN THE LAW CREATES NEW AUTHORITY FOR REMOVAL.

46.    Pursuant to 28 U.S.C. § 1446(b)(3), a notice of removal may be filed within thirty days after the defendant receives "a copy of an amended pleading, motion, order, or other paper from which it may first be ascertained that the case is one which is or has become removable."

47.    In the Ninth Circuit, "a defendant who fails in an attempt to remove on the initial pleadings can file a removal petition when subsequent pleadings or events reveal a new and different grounds for removal." *Kirkbride v. Continental Casualty Co.*, 933 F.2d 729, 731 (9th Cir. 1991) (quoting *FDIC v. Santiago Plaza*, 598 F. 2d 634, 636 (1st Cir. 1979)). In *Kirkbride*, the Ninth Circuit found that new legislation which was enacted prior to the plaintiff's initial removal petition created sufficient grounds for successive removal under 28 U.S.C. § 1446(b)(3). *See id.*

48.    Similarly, in *Rea v. Michael's Stores, Inc.*, the defendants' original removal petition was denied when the district court found that the requisite amount in

16

controversy was not met for plaintiffs' class action due to an express disclaimer. *See* 742 F.3d 1234, 1236 (9th Cir. 2014). However, following a Supreme Court decision pertaining to such disclaimers, the Ninth Circuit found that successive removal was appropriate because the change in the law was a "relevant change in circumstances . . . justifying a reconsideration of a successive, good faith petition for removal." *Id.* at 1238.

49.     Likewise, in *Reyes v. Dollar Tree Stores, Inc.*, the plaintiffs argued that a class certification order expanding the proposed class definition did not create sufficient new grounds for removal. 781 F. 3d 1185, 1189 (9th Cir. 2015). However, the Ninth Circuit held that "because the first remand was 'on grounds that subsequently became incorrect,' the successive removal was permissive." *Id.* (quoting *Rea*, 742 F. 3d at 1238).

50.     Indeed, since the *Rea* decision was issued, courts in the Ninth Circuit have routinely held that successive removal is permissive following an intervening change in the law. *See, e.g., Fritsch v. Swift Transp. Co. of Ariz.,* LLC, 899 F.3d 785, 789 (9th Cir. 2018) ("A defendant can file a successive removal notice within 30 days after a change in law that revealed the facts necessary for federal court jurisdiction"); *Taylor v. Cox Communs. Cal., LLC*, 673 Fed. Appx. 734, 735 (9th Cir. 2016) (same); *Goodman v. Wells Fargo Bank, N.A.*, 602 Fed. Appx. 681, 682 (9th Cir. 2015) (finding that an intervening Ninth Circuit decision clarifying the citizenship of national banks was a "relevant change in circumstances" justifying successive removal under 28 U.S.C. § 1446(b)(3)); *Skau v. JBS Carriers*, No. C18-00681-RAJ, 2018 U.S. Dist. LEXIS 216853, at *4-5 (W.D. Wash. Dec. 27, 2018) (denying motion for remand following successive removal due to intervening change in law concerning the applicability of attorneys' fees to the amount in controversy requirement in a diversity case).

51.     Most recently, in a strikingly similar case involving claims against a post-acute long-term care facility in the Superior Court of Los Angeles, the defendants filed

**NOTICE OF REMOVAL OF ACTION**

a second removal notice with this Court following the Fourth Amendment, in which the Secretary stated for the first time that the *Grable* doctrine provided a basis for federal jurisdiction.  This removal was made after supporting comments by Judge Fujie in the Superior Court of Los Angeles who suggested that, following the Fourth Amendment, "[i]f the Superior Court does not have jurisdiction, someone does." *See Martin v. Serrano Post Acute LLC*, No. 2:21-cv-00187-FMO-AGR (C.D. Cal), Dkt. No. 1 at ¶ 13.

52.    Here, the new authority from HHS deeming the PREP Act a complete preemption statute creates a compelling change in the law supporting a second removal, as it effectively renders moot the grounds upon which the original remand order was predicated. *See Rea*, 742 F. 3d at 1238. Further, AO 21-01 provides controlling authority that the Secretary has mandated courts "must" use to resolve jurisdictional disputes involving "nursing homes and other healthcare facilities, where patients or their estates allege that patients contracted COVID-19 because the facility, among other things, failed to provide its staff with personal protective equipment ("PPE"), failed to teach the staff how to properly use that equipment, or failed to ensure that its staff used the PPE that it had been given." *See* AO 21-01.

53.    Through AO 21-01, the Secretary explains for the first time that  (1) the PREP Act "extends immunity to **anything** 'relating to' the administration of a covered countermeasure" **including the non-use** of covered countermeasures; (2) when the PREP Act is triggered, the doctrine of **complete preemption** attaches, which serves as a "basis for federal question removal under 28 U.S.C. § 1441(a);" and (3) "the secretarial determination provides the underlying basis for invoking the *Grable* doctrine with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." *See* AO 21-01 (emphasis added).

## IV.    FEDERAL JURISDICTION LIES IN THIS COURT BECAUSE THE PREP ACT COMPLETELY PREEMPTS PLAINTIFFS' CLAIMS.

**NOTICE OF REMOVAL OF ACTION**

54.     AO 21-01 unequivocally states that "[t]he PREP Act is a 'Complete Preemption' Statute," because it establishes both a federal and administrative cause of action as the only viable claim, and vests exclusive jurisdiction in federal court."

55.     The PREP Act is not only invoked by Plaintiffs' factual allegations, it completely preempts "all claims of loss," whether statutory or common law claims, that are "caused by, arising out of, relating to, or resulting from the administration or use of a covered countermeasure." 42 U.S.C. § 247d–6d(a)(1)&(b). "Loss" broadly includes "any type of loss." *Id.* Indeed, no state may establish "any provision of law" that is different from, or is in conflict with, any requirement of the PREP Act. *Id.* at § (b)(8).

56.     In other words, during the designated period of time of the Secretary's Declaration, a claimant may not pursue ordinary state law claims under statutory or common law to achieve a different result or more monetary damages than provided by the PREP Act.  Here, because the PREP Act is invoked by virtue of Defendants being Covered Persons who engaged in the use and non-use Covered Countermeasures, complete preemption applies. Accordingly, jurisdiction must lie in this Court.

**A.     Defendants Are Covered Persons Who Engaged In Covered Countermeasures.**

57.     The PREP Act completely preempts state law claims and affords immunity protection from liability and suit to "covered persons" who engaged in "recommended activities" by using "covered countermeasures" during times of national emergency, such as COVID-19.[20]

---

[20]     A federal or state statute may be invoked in a complaint, even if it is not mentioned by name.  *See JKC3H8 v. Colton*, 221 Cal. App. 4th 468, 478 (Cal. App. 2013). To allow a plaintiff to avoid the PREP Act through artful pleading "would totally frustrate the Legislature's objective of providing a quick and inexpensive method of unmasking and dismissing such suits." *Id.*

**NOTICE OF REMOVAL OF ACTION**

CLARKHILL\61560\410577\261999860.v1-2/5/21

58.    Defendants in this action are "covered persons" under the PREP Act as their facility located at Sunrise Villa Culver City is a residential care facility for the elderly licensed by the State of California.  *See* 42 U.S.C. § 247d-6d(i)(2); Advisory Opinion on the PREP Act, *available at* https://www.hhs.gov/sites/default/files/prep-act-advisory-opinion-april-14-2020.pdf; AO 20-04.

59.    Further, Defendants are Covered Persons because they meet the requirements of a "program planner" of countermeasures under the PREP Act and are "qualified persons who prescribed, administered or dispensed" a countermeasure under the PREP Act.[21]

60.    Specifically, Defendants were acting as "program planners" that supervised the infection control program, under which FDA-approved PPE, such as N95 respirators, face shields and masks, gloves, and gowns, as well as diagnostic countermeasures, sanitizers and disinfectants, were distributed and administered to Mr. Hopman and the staff at Sunrise Villa Culver City in an effort to diagnose, mitigate, and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.  Further, Defendants' employees and affiliates were acting as employees of a "program planner" that supervised and administered the infection control program that provided and administered FDA approved countermeasures on Mr. Hopman and the staff of the Facility in an effort to diagnose and mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.  *See id.*

61.    Because Defendants acted in their statutory role as program planners to make reasonable choices in allocating covered countermeasures, manage the infection control program, prioritize the administration or use of covered countermeasures, and follow applicable guidance, all of the actions, omissions, and failures to act as described above are examples of covered countermeasures under the PREP Act.

---

[21]    *See* Advisory Opinion on the PREP Act, *available at* https://www.hhs.gov/sites/default/files/prep-act-advisory-opinion-april-14-2020.pdf.

**NOTICE OF REMOVAL OF ACTION**

62.     Defendants' employees and affiliates in this action also were acting as "qualified persons" under 42 U.S.C. § 247d-6d because their employees were authorized to administer, deliver, and use FDA covered countermeasures, such as PPE and FDA approved COVID-19 devices and diagnostic tests, to diagnose and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom. *See* AO 20-04.

63.     Defendants were engaged in the management and operation of countermeasure programs in an effort to diagnose and prevent COVID-19, or the transmission of SARS-coV-2 or a virus mutating therefrom to a "population" and within a "geographic area" specified by the Declaration Under the PREP Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020) and all amendments thereto -- or reasonably believed so by Defendants.

64.     The infection control program administered by Defendants constituted engagement in "recommended activities" for "covered countermeasures" during the COVID-19 global pandemic and national health emergency, as such terms are defined in the PREP Act.

**B.      PREP Act Immunity Extends To A Covered Person's Failure To Act Or Inaction.**

65.     The PREP Act provides, in pertinent part, that:

> Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

42 U.S.C. § 247d-6d(a)(1) (emphasis added).  The PREP Act further provides that immunity "applies to any claim for loss that has a causal relationship with the

**NOTICE OF REMOVAL OF ACTION**

administration to or use by an individual of a covered countermeasure . . . or use of such countermeasure.  42 U.S.C. § 247d-6d(a)(2)(B).

66.     AO 21-01 rejects the notion that immunity under the PREP Act requires actual "use" of a covered countermeasure.  Specifically, AO 21-01 provides that "this 'black and white' view clashes with the plain language of the PREP Act, which extends immunity to **anything** '**relating to**' the administration of a covered countermeasure." *See* AO 21-01 (citations omitted) (emphasis added)).

67.     AO 21-01 further provides that "[p]rioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declarations liability protections. *There can potentially be other situations where a conscious decision not to use a covered countermeasure could relate to the administration of the countermeasure.*" *See* AO 21-01 (emphasis added).

68.     Additionally, AO 21-01 explains that "program planners" fall within the set of "covered persons" under the PREP Act and that "decision-making that leads to the *non-use of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act.*" *See* AO 21-01 (emphasis added).

69.     The implementing Declaration also expressly addresses inaction, as the Secretary defined "administration" of covered countermeasures to include not only physical use, but *nonuse*, such as activities and decisions, as well as management and operation, of countermeasure programs generally.  This distinction makes "explicit that there can be situations where *not* administering a covered countermeasure to a particular individual can fall within the PREP Act and this Declaration's liability protections."  85 Fed. Reg. 79190 (emphasis added).

70.     These definitions are consistent with the plain language of the PREP Act, which addresses both "acts *and omissions*" – the latter of which means failure to act. 42 U.S.C. § 247d-6d(c)(4).

71.     Because Defendants are Covered Persons and because Plaintiffs'
allegations all concern Defendants' conscious decisions to use or not use covered
countermeasures, including COVID-19 testing and PPE, Plaintiffs' claims squarely fall
within the PREP Act.

72.     As confirmed in AO 21-01, when the PREP Act is triggered, complete
preemption attaches. Indeed, "[t]he *sine qua non* of a statute that completely preempts
is that it establishes either a federal cause of action, administrative or judicial, as the
only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does
both." *See* AO 21-01.

73.     Despite Plaintiffs' assertion of state law claims, the doctrine of complete
preemption is invoked and jurisdiction over these claims is exclusively federal. *See
Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003) ("When the federal statute
completely preempts the state-law cause of action, a claim which comes within the
scope of that cause of action, even if pleaded in terms of state law, is in reality based
on federal law.").

74.     Because the allegations in Plaintiffs' Complaint invoke the PREP Act, this
action is subject to removal under the doctrine of complete preemption.

## V.     FEDERAL QUESTION JURISDICTION EXISTS PURSUANT TO THE *GRABLE* DOCTRINE.

75.     In addition to complete preemption, AO 21-01 confirms that the PREP
Act confers separate, independent grounds for federal question jurisdiction under the
*Grable* doctrine. *See* AO 21-01.

76.     AO 21-01 confirms that "ordaining the metes and bounds of PREP Act
protection in the context of a national health emergency necessarily means that the case
belongs in federal court." AO 21-01 highlights the Secretary's conclusion in the
Declaration that "there are substantial federal legal and policy issues, and substantial
federal legal and policy interests within the meaning of [the *Grable* doctrine] in having

**NOTICE OF REMOVAL OF ACTION**
CLARKHILL\61560\410577\261999860.v1-2/5/21

1  a unified, whole-of-nation response to the COVID-19 pandemic among federal, state,

2  local, and private-sector entities." AO 21-01 (quoting 85 Fed. Reg. at 79, 197(col. c)).

3     77.   The Advisory Opinion's interpretation of Grable is consistent with the

4  Supreme Court's long-standing rule "that in certain cases federal question jurisdiction

5  will lie over state-law claims that implicate federal issues."  *Grable & Sons Metal*

6  *Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  "The doctrine captures

7  the commonsense notion that a federal court ought to be able to hear claims recognized

8  under state law that nonetheless turn on substantial questions of federal law, and thus

9  justify resort to the experience, solicitude, and hope of uniformity that a federal forum

10 offers on federal issues." *Id*.

11    78.   The *Grable* Court determined that no single, precise test exists for

12 determining whether an embedded federal issue exists, but that, in general, a two-step

13 process exists for determining whether a state law claim "arises under" federal law: (1)

14 the state law claim must necessarily raise a stated federal issue that is actually disputed

15 and substantial; and (2) federal courts must be able to entertain the state law claims

16 "without disturbing a congressionally approved balance of state and federal judicial

17 responsibilities." 545 U.S. at 314.  Here, both prongs are satisfied.

18    79.   First, Plaintiffs bring claims as a result for Defendants' alleged use or

19 administration (or nonuse or nonadministration) of covered countermeasures in

20 connection with the care and treatment of Mr. Hopman, which necessarily implicates

21 disputed and substantial federal issues.  *See* 42 U.S.C. § 247d-6d.

22    80.   Second, as confirmed by the Advisory Opinion and the Declaration, the

23 PREP Act expresses a clear intention to supersede and preempt state control of the very

24 issues raised by Plaintiffs, *i.e.*, issues concerning Defendants' conscious decisions to

25 use or not use covered countermeasures, including COVID-19 testing and PPE.  A

26 substantial and disputed federal issue regarding the application of the PREP Act to

27 Plaintiffs' claims therefore necessarily exists, and must be resolved by this Court to

28 ensure the uniform and appropriate application of the PREP Act.

**NOTICE OF REMOVAL OF ACTION**

81. Courts have long recognized federal jurisdiction under the *Grable* doctrine. *See, e.g., McKay v. City & Cty. of San Francisco,* No. 16-CV-03561 NC, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (finding federal jurisdiction under *Grable* where plaintiff's request that court enjoin use of flight paths was "tantamount" to a challenge to the validity of an FAA decision); *Bender v. Jordan,* 623 F.3d 1128, 1131 (D.C. Cir. 2010) (finding federal jurisdiction under *Grable* where breach of contract action arose under federal law because agreement was required by federal law and turned on interpretation of federal regulations).

82. The two-step process is also satisfied where the alleged dispute "could have" supported the defendant's assertion of a federal declaratory judgment action. *See Hollyvale Rental Holdings, LLC v. Baum,* No. 216CV02888RFBPAL, 2018 WL 1608411, at *3 (D. Nev. Mar. 31, 2018) (*Grable* federal question jurisdiction existed under the "coercive action" doctrine where defendant "could have … brought a separate federal declaratory judgment action ….").

83. The *Grable* doctrine and PREP Act are therefore directly applicable to Plaintiffs' claims and support this Court's jurisdiction.

**WHEREFORE,** having shown that this case is properly removable, Defendants provide notice pursuant to 28 U.S.C.A. § 1446 that the Action pending in Superior Court for the County of Los Angeles, California, Case No. 20STCV25558, is removed to the United States District Court for the Central District of California, and respectfully request that this Court exercise jurisdiction over this case.

DATED:  February 4, 2021

**CLARK HILL LLP**

By: /s/ Michael P. West
      Michael P. West
      Ashley Escudero
      Attorneys for Defendants,
      Sunrise Senior Living Management, Inc.;
      Welltower OpCo Group, LLC dba Sunrise
      Villa Culver City, and Shane Fowler

**NOTICE OF REMOVAL OF ACTION**

1

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of February, 2021, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then be sent Electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent by first class mail to any counsel of record indicated as non-registered participants.

Dated: February 4, 2021

/s/ Michael P. West
Michael P. West

*Attorneys for Defendants,*
Sunrise Senior Living Management, Inc.,
Welltower OpCo Group, LLC dba Sunrise
Villa Culver City, and Shane Fowler

*Attorney for Plaintiffs:*

Michael F. Moran, Esq.
Lisa Trinh Flint, Esq.
**MORAN LAW**
5 Hutton Centre Drive, Suite 1050
Santa Ana, CA  92707
Tel:  (714) 549-0333
Fax:  (714) 549-0444
Email:  mmoran@moranelderlaw.com
Email:  lflint@moranelderlaw.com

260470895.v1